## Drexel Estate

Before Klein, P. J., Bolger, Lefever, Saylor and Shoyer, JJ.

*Paul Maloney, Victor L. Drexel* and *J. Harry La-Brum*, for exceptants.

*Cuthbert H. Latta* and *Frank W. Melvin*, contra.

SHOYER, J., November 27, 1959.—John Armstrong Drexel, a grandson of testator, Anthony J. Drexel, having recently died (1958) without issue, the question arises as to the distribution of the share of income previously paid him. Testator, who was a well known banker and philanthropist, left a large estate at his death in 1893. Income from his residuary trust was shared equally by four children, and the issue of deceased children per stirpes, until the death of testator's son George without issue in 1944. The stirpes then became three.

Specifically the question before the court is whether John Armstrong Drexel's one-twelfth share of the

income shall remain in the stirpital line of his father, Anthony J. Drexel (1934),[1] or be divided into three major divisions so that the descendants of his father's sister, Sarah Drexel Van Rensselaer, and brother, John R. Drexel, shall also receive a portion, some as little as a 1/72nd part.

The one-twelfth share amounts to some $65,000 annually, and since the same problem may twice recur before the termination of this trust,[2] the question is an important one. One guardian and trustee ad litem was appointed by the learned auditing judge to represent the minors and unborn interests in the Van Rensselaer line, this line having made claim for a broad distribution which would include their line and also John R. Drexel's. An additional guardian and trustee ad litem was appointed to represent the otherwise unrepresented interests in the John R. Drexel and Anthony J. Drexel (1934) lines. Both points of view have been fully presented in brief and oral argument.

Before analyzing the will of Anthony J. Drexel it is desirable to state the clearly settled rules of construction which have been so often repeated. In Weaver Estate, 390 Pa. 128, 131, quoting with approval from McFadden Estate, 381 Pa. 464, 467, and Lifter Estate, 377 Pa. 227, 231, the court said: " ' "The intention of the testator is the pole star in the interpretation of every will and that intention must be ascertained from a consideration of the *entire will, including its scheme of distribution as well as its language*,[3] together with

---

[1] Since a living grandson in this line is named Anthony J. Drexel, Jr., the deceased son of testator, who bore the same name as testator, is referred to by the date of his death.

[2] Two living grandchildren in the John R. Drexel line, each of whom now receives a one-ninth share of the income, will undoubtedly die without issue.

[3] Italics supplied throughout.

all the surrounding and attendant circumstances: [citing cases]." ' "

"In construing a will it is ·the court's first duty to examine the will and, if possible, ascertain its meaning without reference to ·canons of construction": Walker Estate, 376 Pa. 16, 18.

" 'When the intention of the testator can be ascertained by an examination of his entire will . . . "technical rules or canons of construction are unnecessary" . . .

" ' " ' "It is only where the intent is uncertain or the language ambiguous that such canons should be resorted to" ' " ' ": Richley Estate, 394 Pa. 188, 193.

This will, executed some 18 months before testator's death, comprises 25 articles or paragraphs, together with five codicils. It is wordy. It lacks terseness and conciseness, attributes which are universally recommended for achieving clarity of expression. It is prolix to the point of diffusion, revealing an undoubted error in the phrase "of any [my] will" in the nineteenth article, and contradictions in the sixteenth. It is the ambiguities present in this latter article which give rise to the present controversy, and create a vexing problem.

Two of testator's daughters, Emily Biddle and Fanny Drexel Paul, died in his lifetime, and testator created separate trusts for their children and issue in article eleventh and the codicil of January 3, 1893, respectively.

Articles fourteenth to twentieth, inclusive, of the will are concerned with the duties of the trustees, and the duration and termination of the residuary trust for testator's other children. Except for the sixteenth article they may be paraphrased as follows:

Article fourteenth refers to the time of testator's death and directs the trustees to collect the income and after deducting the expenses to

I. Hold the net income in trust for testator's children who survive him and the lawful issue of such as are then dead, share and share alike, such issue taking by representation, and

II. Pay to each of testator's children who are then married or have arrived at age 21, and to the lawful issue of such as may then be dead, their shares of said income.

Article fifteenth provides that should any of testator's children die during the continuance of the trust, leaving issue then surviving, such issue shall take the share of income the parent would have taken if living, during the continuance of the trust.

Article sixteenth, which is the controversial article, is set forth in full:

"*ARTICLE SIXTEENTH.* Should any of the *persons* entitled to share in the income of the residue of my estate die during the continuance of the trusts under this will, without issue living at their respective deaths, then the share or portion of the principal, the income of which the person so dying had received, or so much thereof, as shall not have been disposed of by will by my children, under the power to grant by will the sum of Two hundred thousand dollars, hereinafter conferred upon each of them, shall *fall back into*, and remain a part of the residue of my estate, and be *held* by the Trustees as to the *income* thereof for the use and benefit of [4] my surviving children and of the children or issue of any of them that may be deceased and shall eventually as to the principal, be divided and distributed upon the termination of the trusts hereunder among my then living descendants, in the same manner, and for the same purposes, and to the same persons, *in the same proportions as are provided for*

---

[4] In his analysis of article sixteenth, the auditing judge interpolated the adjective "*all*" at this place.

*in my will as to the residue of my estate* and as though *such child or children* had been dead before my death leaving no children or issue surviving."

Article seventeenth provides for the duration of the trust during the lifetime of the last surviving child or last surviving grandchild, whichever shall live the longest, living at testator's death, and for 21 years thereafter.

Article eighteenth provides that at the termination of the trust the principal shall be divided among the issue of testator's children then living, "each one of my children . . . being held as the *unit* according to which the issue of such child shall take respectively, such issue taking per stirpes, and not per capita; and *in all instances* in which the question may arise as to the *income*, as well as the principal, of my estate, the issue of any deceased child or descendant of such child, shall take per stirpes and not per capita." There is also a spendthrift provision as to *income* for "my children and their issue during their lives", and as to principal so that "neither the *income* nor the principal accruing to any such child or issue shall be liable to be assigned, etc."

Article nineteenth: So much of this article as is necessary to adequately abstract the same may be quoted as follows: "I further . . . direct, that each of my said children shall have the power to dispose by will . . . of Two hundred thousand dollars of the principal, the income of which is given to such child. . . ." This article as it appears in the will actually comprises 184 words, or 150 more than those required for the above quotation. The additional words, while reiterating per stirpes distribution of income to issue of a deceased child, add nothing to effectuate the gift of $200,000 out of principal.

Article twentieth: "Subject to the special bequests and directions which I have made, my purpose and will

is" that the *residue* shall continue in trust for 21 years after the death of testator's last surviving child or last surviving grandchild who may be living at the time of testator's death; "that the *income* therefrom shall be divided among my children . . . and their issue, during that period, share and share alike, the issue of each deceased child *in all instances* taking per stirpes and not per capita", and that upon the expiration of the trust the residue "shall be divided among the issue of my children . . . then living, who shall *in every instance* take per stirpes and not per capita, my children being the *unit* by which the distribution shall be determined", and no beneficiary may anticipate, etc., "such *income* or . . . principal".

The learned auditing judge recognized that the general scheme of the will provided for stirpital distribution of both income and principal, for, with the exception of article seventeenth, there is such expression of intent as to income, or principal, or both, in each of the above mentioned articles. However, he was of the opinion that article sixteenth described "precisely" the situation occurring upon the death of John Armstrong Drexel without issue and, following his own appraisal of this language as "plain, clear [and] simple", he held that this deceased grandson's share of income must henceforth be distributed among three stirpes instead of remaining in the Anthony J. Drexel (1934) line alone. He found the language of article sixteenth to be "clear, unequivocal and specific", but in reaching this conclusion he interpreted the verb "hold" to mean "distribute", interpolated the adjective "*all*" to find an intent to divide income among "*all*" three stirpes, and ignored the disparity between "persons" and "children". In the presence of article sixteenth's "specific" intent, he held that testator's "dominant general intent" must yield.

In our considered opinion article sixteenth is ambiguous. The use of the all-inclusive word "persons" in the first clause is inconsistent with "such child or children" appearing in the next to last clause. "Such" refers to something previously mentioned. As defined by Webster, New International Dictionary (2nd ed., 1959), it means "before-mentioned; previously characterized or specified; as, in default of such issue. . . ." The case of March v. Banus, 395 Pa. 629, 633, holding that "such notice" meant not merely notice but the "ten day notice" mentioned earlier in the same section of a statute, forcefully illustrates the legal meaning of "such" as referring to its previously designated subject without any modification or variation whatsoever. As used in article sixteenth it would equate "child or children" with "persons"—i.e., the lesser with the greater, a part with the whole—obviously an impossibility.

Additionally, the expression "fall back into . . . the residue" is both inaccurate and inapt, referring as it does to what has always been an *undivided portion* of the residue, and hence never out of the residue. Appropriately enough we find similar language in the Biddle and Paul trusts, where, upon an ultimate failure of issue, the separate trust corpus is to "fall into the residue". Again, the later clause in article sixteenth which reads "in the same proportions as are provided for in my will as to the residue of my estate" would also be appropriate in the other two trusts but is obviously out of place here.

Finally, we know of no warrant for construing the verb "hold" to mean "distribute". These words are antonyms, not synonyms. We especially note testator's own use of "hold" and "pay" in article fourteenth where his two specific instructions to the trustees are placed in separate subparagraphs I and II. To give "held" its common meaning will not nullify article

sixteenth either in whole or in part. On the contrary, it will give reasonable effect to this definitely ambiguous paragraph in conformity with testator's "probable intention and be most agreeable to reason and justice": Jackson's Estate, 337 Pa. 561, 565, 567.

By logical sequence, article sixteenth was intended to provide for the contingency of testator's surviving children who might die *without* issue, for in article fifteenth such issue surviving had just been awarded the income per stirpes. In similar vein the scrivener might well have provided in a hypothetical article seventeenth for distribution of income during the continuance of the trust upon the death of grandchildren or their descendants leaving issue, and in a hypothetical article eighteenth for such persons dying without issue. Instead of extending these provisions into separate articles, however, he endeavored to provide for all three contingencies in the one article sixteenth. With these contingent events compressed into one article, he also sought to combine the limitation to life estates of the interests of all children, grandchildren and other issue who might die before the termination of the trust, whether they should die leaving issue or not. From the broad inclusion denoted by "persons" with which he commenced this article, he narrowed its application at the end to the death of *children* only. Elsewhere the scrivener was careful to restrict *children* to the first generation of testator's descendants, so we are not free to give this word a broader meaning here. But no harm was done, because in providing expressly that the principal should be "held . . . as to the income", he avoided any direction as to *how the income should be distributed*, even by implication. The direction to benefit surviving children and the issue of those deceased does not require an immediate distribution to the other lines of descent. Those lines are protected as to principal, and will

benefit directly from the income upon a *complete failure* of the Anthony J. Drexel (1934) issue, even though the latter now retain their full stirpital share.

The statement by our Supreme Court in Lefebvre v. D'Arcy, 236 Pa. 235, 238, is pertinent: ". . . in construing a will, regard must be had to its whole scheme, and if it is found that a particular intent is inconsistent with a general intent, the former must give way to the latter: Ferry's Appeal, 102 Pa. 207; Jones v. Strong, 142 Pa. 496. . . . 'If the main provision plainly covers the whole subject, and is defined in terms that exclude all doubt, and the subsidiary provision may by conjecture be made either general or partial, and may be capable by construction either of subverting entirely or of modifying only the original gift, such a subsidiary provision must in the ordinary case be confined to its partial and restricted operation. It is said in 1 Redfield on Wills *438, that "plain and distinct words are only to be controlled by words equally plain and distinct." Such words, to have a controlling effect, must at least possess a definite and certain meaning. The clearly-expressed purpose of a testator is not to be overborne by modifying directions that are ambiguous and equivocal, and may justify either of two opposite interpretations. Such directions are to be so construed as to support the testator's distinctly announced main intention.' "

In Walker Estate, supra, the late Mr. Justice Stearne appropriately said, page 22: ". . . We are required to consider intent from the whole will, construed from its four corners. . . . Regard must be had to the whole scheme, and if it is found that a particular intent is inconsistent with a general intent, the former must give way to the latter. . . . A construction will be avoided which would lead to an unnatural, improbable or absurd result, and which, under all the language in the will, would constitute a highly improbable testa-

mentary intent." See also Willing Estate, 18 D. & C. 2d 11, where our brother, President Judge Klein, refused to permit the scrivener's "careless" language to upset testatrix' dominant intention as expressed in her otherwise clearly defined plan.

Exploring the four corners of the will and codicils from the vantage point of testator's armchair (Britt Estate, 369 Pa. 450, 455; Jackson's Estate, 337 Pa. 561, 566; McGlathery's Estate, 311 Pa. 351, 355), we find convincing evidence that testator, when drawing his will, thought of the distribution of residuary income as well as principal solely on a stirpital basis. Thus in article fourth it is apparent that testator held a mental image of his children as *individuals* not only in regard to the division of his property but also in the terms of their relationship to the vast banking business which he had established, and which was the foundation of his fortune. He there empowered his executors for the purpose of continuing Drexel and Company to advance "to any one or more of my sons or sons-in-law, . . . a sum not exceeding fifty per cent of the *amount of the share of such son or the wife of such son-in-law*". To make such authorized advance the executors would necessarily have to set up the residue on a stirpital basis. Only in this way could the *amount of a child's share* be determined. It is noted that in the third item of the codicil of January 3, 1893, testator extended the provisions of article fourth to his former son-in-law, James W. Paul, Jr., after Fanny Drexel Paul's death.

Further evidence of testator's stirpital thinking is found in the Biddle and Paul trusts, and in his undated codicil wherein he anticipated the death of his son, George W. C. Drexel, without issue, and made a conditional gift of $500,000 to his widow. In both Biddle and Paul trusts he names the individual grandchildren to whom he gives a trust fund of one million each. This amount was not out of line with the interest

that his other grandchildren would probably receive on a stirpital basis especially in view of the fact that the Biddle and Paul grandchildren would receive the income from their shares directly at age 21, whereas their first cousins would receive nothing until the death of their respective parents.

In ruling the disposition of John Armstrong Drexel's share of income in accordance with testator's dominant intent, we are adhering not only to the very definite and precise language of articles eighteenth and twentieth as to "unit" distribution, but to the direction for per stirpes distribution of both income and principal as clearly expressed in the Biddle and Paul trusts and the Drexel Building trust: Article twelfth. While articles eighteenth and twentieth relate primarily to the distribution of principal at the termination of the trust, they both speak with unmistakable clarity of a per stirpes distribution of income while the trust continues. We are also certain that the exception expressed in article twentieth relates, both in language and proximity, to the $200,000 gifts carved out of residue in article nineteenth, and that this exception has no reference to the sixteenth article.

Our conclusion will give the same effect to the death of John Armstrong Drexel occurring after testator's death as if he had died before, thus preventing an accidental and irrelevant fact from having an effect contrary to the manifest general intent: Fox's Estate, 222 Pa. 108, 113. Furthermore, we may reasonably infer that testator did not wish any beneficiary to take a greater proportion of benefits during the continuance of the trust than that same beneficiary would receive upon the trust's termination: Hannach's Estate, 332 Pa. 145, 149.

For the several reasons above set forth, we sustain the exceptions and, subject to the above modification, the adjudication is confirmed absolutely.

Lefever, J., dissents.

LEFEVER, J., dissenting, November 27, 1959.—I adhere to the interpretation of the will as set forth in my adjudication in this estate. Therefore, I dissent.